**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO.**

JOSHUA EPSTEIN

     *Plaintiff,*

v.

TOWN OF SURFSIDE,
FLORIDA,

SHLOMO DANZINGER,
Former Mayor of Surfside,
sued in his individual capacity;

JEFFREY ROSE,
Former Vice Mayor of Surfside,
sued in his individual capacity;

HECTOR GOMEZ,
Former Surfside Town Manager,
sued in his individual capacity;

and

ANTONIO MARCIANTE,
Former Surfside Police Chief,
sued in his individual capacity,

     *Defendants.*
_____/

## COMPLAINT AND JURY DEMAND

Plaintiff, Joshua Epstein ("Joshua" or "Plaintiff") files the following complaint against the

Town of Surfside ("Surfside" or "Town"), Shlomo Danzinger ("Danzinger"), Jeffrey Rose

("Rose"), Hector Gomez ("Gomez"), and Antonio Marciante ("Marciante," collectively,

"Individual Defendants"), for their deprivation of Plaintiff's rights under the First and Fourteenth

Amendments to the United States Constitution.

## INTRODUCTION

*"The golden rule is that he who has the gold makes the rule."*
Shlomo Danzinger, then-Mayor of Surfside[1]

1.      The United States Constitution affords all citizens certain rights that set our great country apart from the rest. Those fundamental rights include the right to free speech and the right to be free from unconstitutional arrests. The Town of Surfside, through its public officials, trampled on Joshua's fundamental rights by unjustly using town resources to harass, attack, silence and punish him for his protected speech—even going as far as wrongfully incarcerating him. This disturbing abuse of power occurred simply because Joshua exercised his First Amendment right to speak out during an election against his elected officials, a right that is constitutionally guaranteed to be free from political payback and retribution.

2.      In 2024, Joshua was an amateur journalist and community activist.  He has been a vocal persistent critic of Danzinger and Rose since they were elected as Vice Mayor and Mayor of Surfside in March 2022 until they lost their reelection bid in March 2024. Joshua's free speech evolved from opposing Danzinger and Rose's policies on social issues to advocating against corruption and conflicts of interest.

3.      As Joshua's speech evolved, Defendants' First Amendment retaliation escalated from harassment and disparagement to Joshua's retaliatory arrest.

4.      Several acts of Joshua's free speech pushed Defendants' campaign of intimidation to an unimaginable level.

---

[1] *See* Mar. 12, 2024 Surfside Commission Meeting, available at
https://play.champds.com/surfsidefl/event/305.

5.      In the months leading up to the 2024 Surfside election, Joshua posted videos to NextDoor—a platform widely used by Surfside residents to stay informed—showing him questioning then-Mayor Danzinger about his previously undisclosed October 2022 trip to Dubai to meet with DAMAC, the developer of the Champlain Towers site.

6.      Joshua then shared information on NextDoor and via email through the Surfside Tomorrow activist group newsletter—a parody of Rose and Danzinger's "Surfside Tomorrow" newsletter—revealing that then-Mayor Danzinger and then-Vice Mayor Rose's campaigns received substantial financial support from developers, highlighting their conflicts of interest to Surfside residents.

7.      Then, on February 28, 2024, Joshua recorded and distributed a video on NextDoor of an enraged Rose, who was running for reelection, to Surfside voters shortly before the hotly contested election. The next day, Joshua distributed the video via email to approximately 5,185 Surfside residents through the Surfside Tomorrow activist group newsletter.

8.      Joshua's video of Rose's rage went viral. In Joshua's video, as shown below, Rose is captured yelling and pointing at Joshua, getting more incensed at him for filming his tirade, yelling that Joshua is "just like his mother," referring to Eliana Salzhauer ("Eliana"), who was not present, and threatening Joshua that he will "see what happens" ("Rose Rage Video").



9.      In a disturbing response to Joshua's protected speech, Defendants orchestrated a premeditated campaign of retaliation against Joshua.

10.     To punish Joshua for his free speech, Defendants had Joshua arrested and thrown in jail on a false felony charge for allegedly battering Rose. Joshua was only eighteen years old at the time of the false arrest.

11.     Defendants decided to charge Joshua under Florida Statutes § 784.081(2) with felony battery to ensure he was jailed upon his arrest and to inflict the greatest punishment for Joshua's speech. Yet, according to the Miami-Dade State Attorney's Office ("Miami SAO") and Miami-Dade County arrest records, that statute is not used to charge for battery against elected officials. In Surfside, Joshua is the only person who has been arrested under this statute in the last five years.

12.     In fact, prosecutors in the Miami SAO explained the inapplicability of Florida Statutes § 784.081(2) when evaluating Joshua's retaliatory arrest, stating: "It clearly does not apply to all elected officials…but to specified officials within the school district, to wit: 'educators.' The statute and case law are very clear….no further clarification is needed."

13.     Joshua—a journalist who will soon be a lawyer[2]—brings this lawsuit to protect the First Amendment and ensure that public officials do not abuse their power to punish those who oppose them.

14.     The disparagement, harassment, intimidation, and Joshua's false arrest were unlawful because they were engineered as part of a high-level policy to retaliate against Joshua's exercise of political speech.

15.     This was a long-term and pervasive policy and involved significant deliberations—outside of split-second decision making—by high-level officials.

16.     Defendants unfortunately succeeded in their attempts to punish Joshua for his free speech. As a result, his reputation has been unjustly smeared, and he has been severely impacted by Defendants' unconstitutional First Amendment retaliation.

17.     The First Amendment lies at the foundation of our democracy. Americans enjoy the fundamental right to participate in the political process and voice their opinions and observations to the community without fear of retribution. If local governments and their officials can—without consequence—punish and intimidate those who engage in political speech, American democracy will fail. This lawsuit is filed in defense of the First Amendment to ensure the constitutional accountability of all government officials.

## <u>JURISDICTION AND VENUE</u>

18.     This is a civil rights case brought under 42 U.S.C. § 1983, and the First and Fourteenth Amendments to the United States Constitution.

19.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201 and 2202.

20.     Venue is proper in this Court under 28 U.S.C. § 1391.

---

[2] Joshua is currently a first-year law student.

## THE PARTIES

21.     Plaintiff Joshua Epstein is a resident of Surfside in Miami-Dade County, Florida.

22.     Defendant Town of Surfside is a municipal entity organized under the laws of the State of Florida.

23.     Defendant Shlomo Danzinger served as Surfside Mayor from March 2022 to March 2024 and is currently seeking re-election. Danzinger is a resident of Surfside in Miami-Dade County, Florida.

24.     Defendant Jeffrey Rose served as Surfside Vice Mayor from March 2022 to March 2024.  Rose is a resident of Surfside in Miami-Dade County, Florida.

25.     Defendant Hector Gomez is the former Surfside Town Manager, serving from approximately December 13, 2022 through April 15, 2024.  Gomez is a resident of Broward County, Florida.

26.     Defendant Antonio Marciante is the former Surfside Chief of Police, serving as chief from approximately December 28, 2023 through March 29, 2024. Marciante is a resident of Broward County, Florida.

27.     At all times mentioned herein, all Individual Defendants were acting under color of law.

## FACTUAL ALLEGATIONS

*Joshua*

28.     Having spent almost his entire life in Surfside, twenty-year-old Joshua is a former amateur journalist who has been a community activist since his early youth.  Joshua attended iPrep Academy's high school in Miami, Florida and later graduated from The New College of Florida

in Sarasota, Florida at age eighteen with a degree in Economics.  Joshua enrolled in law school in Fall 2025.

29.     Joshua obtained university credit while covering Surfside politics in 2024. Over the course of the Spring 2024 semester, Joshua worked for approximately two hundred hours writing about different issues in Surfside after attending Surfside commission meetings and town events.

30.     Joshua was a vocal critic of Danzinger and Rose since they were elected in March 2022, often speaking at commission meetings, calling out their actions to the community and writing a Miami Herald Op-Ed criticizing their policies and practices.

31.     Other than the felony charge at issue in this case—which was ultimately no actioned by the State of Florida—Joshua has no criminal record.

*Surfside*

32.     Defendant Surfside is a municipality located north of Miami Beach, Florida with approximately 6,000 residents.

33.     From March 2022 to March 2024, the Town's government was controlled by a small group of politically powerful people, including former-Mayor Danzinger, former-Vice Mayor Rose, and starting in December 2022, former Town Manager Gomez.

34.     The mayor of Surfside is an elected position. The mayor votes as an equal 1/5 member of the Commission.  Further, the mayor presides over Town commission meetings and has the authority to order and instruct a sergeant-at-arms, typically the chief of police, to maintain order and decorum at commission meetings.

35.     The chief of police of Surfside is appointed by the Town manager and reports to the Town manager.  The chief of police is in charge of the police department and oversees criminal investigations under the direction of the Town manager.

36.     The Surfside Commission is a five-member body of the Town.  The commissioners are elected for two-year terms. They vote to set policy, adopt the Town's budget, approve purchases and contracts and review laws.  They also appoint executive officials, such as the Town manager and Town attorney.

37.     The Town manager of Surfside is appointed for an indefinite period by the Town commission and oversees most day-to-day decision-making independent from the commission. The Town manager is the chief executive officer of Surfside, receiving and accounting for all Town funds and managing Town contracts. The Town manager can also direct the sergeant-at-arms to maintain order at Commission meetings. In addition to appointing the police chief, the Town manager of Surfside directs the Surfside chief of police in connection with his responsibility to enforce order in the Town, and the Town manager can also direct the chief of police's duties. The chief of police is required to carry out the instructions of the Town manager and enforce or implement any directives or official documents that the Town manager issues to him.

38.     The Town attorney for Surfside is appointed by the Town commission.  The Town attorney serves as a legal adviser to the Commission, the Town manager, and all other officers, boards and departments of the Town.

39.     The Town Charter contains a citizens' Bill of Rights, which reinforces the First Amendment and guarantees residents the "Right to be Heard:"

> [A]ny interested person has the right to appear before the Town Commission . . . for the presentation, adjustment or determination of an issue, request or controversy within the jurisdiction of the Town . . . Matters shall be scheduled for the          convenience of the public.  The Town Commission shall adopt agenda procedure and schedule hearings in a manner that will enhance the opportunity for public participation.

40.     The Town Charter prohibits the Commission and its members (including the mayor) from appointing or removing—or directing the Town manager to appoint or remove—any

Town officers or employees. The Town Charter also prohibits the Commission from giving orders to subordinates of the Town manager, such as the chief of police. In turn, the Town manager has the authority to fire a Town employee if he believes it is in the best interest of the Town.

41.     Since the pandemic, Surfside property values have soared, and developers are constantly trying to exploit the Town's valuable beachfront real estate. Surfside has nonetheless managed to preserve its low-density zoning code: Surfside buildings cannot exceed twelve stories, whereas Bal Harbour to the north allows approximately twenty-seven stories, and Sunny Isles, which is farther north, permits approximately sixty stories.

42.     Journalists and activists like Joshua have attempted to shed light on conflicts of interest between the Defendants' connections to developers—who favor larger homes, bigger buildings, expanded boat docks, and more concrete and commercialization of the beach—and residents' desire to preserve Surfside's small-town quality of life and natural coastal beauty.

43.     Surfside is a diverse, tolerant, and welcoming community for all residents regardless of race, religion, and sexual orientation. That tolerance eroded during Danzinger and Rose's reign.

***Danzinger***

44.     Danzinger was elected Mayor of Surfside, serving from March 2022 through March 2024.

45.     When Danzinger presided over Town Commission meetings as mayor pursuant to the Town Charter, Danzinger frequently threatened dissenters (including Joshua, other residents and elected commissioners) with forcible removal. Danzinger often made good on his threats and ordered the Surfside Police Department to remove residents simply because Danzinger disagreed with their protected speech.

46.     Danzinger became known for silencing individuals at commission meetings and creating a lack of transparency in Town affairs as soon as he assumed office. In December 2022, he was named one of the Miami New Times "Dirty Dozen," with the following explanation:

> Danzinger promptly made himself all but inaccessible to journalists at town hall, then opted not to fly the LGBTQ pride flag out front for Pride Month. (He said he supported gay rights but feared making the seaside hamlet vulnerable to flag-flying requests from Satanists and the like.) More recently, Danzinger presided over the so-far unexplained exodus of three top city officials who tendered vague resignation letters. Danzinger's tightlipped tendencies fueled suspicions and, reportedly, an ethics complaint from Burkett alleging that the departures were arranged behind closed doors in violation of Florida's Sunshine Law.[3]

47.     The Miami-Dade Commission on Ethics and Public Trust ("Miami-Dade Ethics Commission") found probable cause in fall 2024 that Danzinger had unethically campaigned for his reelection from the dais at a commission meeting, misusing Town resources in his quest for his (unsuccessful) reelection for mayor of Surfside.  After initially requesting a public hearing which was set for February 12, 2025, Danzinger entered into a settlement agreement.

48.     Danzinger was voted out of office as Surfside Mayor on March 19, 2024.

49.     Danzinger unsuccessfully ran for mayor of Miami-Dade County, Florida in November 2024, garnering 1.88% of the vote. Danzinger is now running for re-election as Mayor of Surfside.

*Rose*

50.     Rose is a successful real estate developer who was one of the largest builders in Surfside during his time in office, with projects and developments on almost every block. Rose

---

[3] *Dirty Dozen 2022: Miami's 12 Least Wanted*, Miami New Times (Dec. 27, 2022), https://www.miaminewtimes.com/news/the-dirty-dozen-2022-meet-miamis-most-ignominious-15938908.

owns multiple properties in Surfside, many of which he used as construction staging areas for his other building projects in town while he was Vice Mayor.

51.     Rose served as Vice Mayor of Surfside from March 2022 through March 2024.

52.     On Danzinger's order, the Surfside Police Department removed Surfside residents who criticized Rose's construction staging practices during commission meetings.

53.     Prior to his election as Vice Mayor, the Miami-Dade Ethics Commission advised Rose that he could run for Surfside vice mayor but must recuse himself from matters that pose conflicts of interest, such as zoning for his properties. Rose as vice mayor did not recuse himself from such matters, voting on measures to change the zoning code to allow three-story residences and larger boat docks, which would and did benefit his clients.

54.     Rose was voted out of office as Surfside Vice Mayor on March 19, 2024.

***Joshua Repeatedly Opposed Danzinger and Rose on Community and Social Impact Issues***

55.     In accordance with his First Amendment rights, Joshua voiced his opposition to Danzinger and Rose almost as soon as they assumed office in 2022 by speaking out at commission meetings and engaging in peaceable assembly. As a journalist, Joshua also wrote articles and engaged with the media to oppose Danzinger and Rose's policies.

56.     Joshua's opposition to Danzinger and Rose began as critiques of social issues and public policy, as illustrated by the below examples.

57.     For example, Joshua spoke out against the pay increases proposed by Danzinger for then Town manager Andy Hyatt ("Hyatt") at the commission meeting on April 27, 2022. Joshua made clear that the Town should prioritize giving raises to all Town employees rather than a significant raise to the one person at the top.

58.     At the May 10, 2022 commission meeting, Joshua publicly opposed an ordinance that created an understory loophole allowing taller homes to be built in Surfside. He also criticized Rose, noting that he failed to recuse himself from votes in which he had a personal financial interest, stating "you ought to not be voting on something that is going to put money in your own pocket."

59.     Joshua next opposed Danzinger's attempt to prohibit the LGBTQ Pride Flag from being flown at the Town's flagpole at the Surfside Community Center in June 2022, disputing Danzinger's position that it would allow "Satanic cults" to fly their flags. Joshua spoke out to oppose Danzinger on this issue at a commission meeting, and helped his mother, Eliana, organize a rally protesting Danzinger's position in front of Town Hall. Joshua was also an active participant in the rally.

60.     During this same time, Joshua publicly opposed Danzinger and Rose's beach chair ordinance, arguing it would lead to the privatization and commercialization of the beach by authorizing commercial vendors, hotels, and buildings to place and preset hundreds of chairs on the sand and not leave enough space for Surfside beachgoers.

61.     In response to Danzinger's proposed legislation to criminalize people experiencing homelessness for using soap at Surfside's outdoor showers, Joshua wrote an Op-Ed piece for the Miami Herald in January of 2023, entitled "Surfside is Better than This. Don't Criminalize Homelessness," opposing this ordinance and urging kindness and understanding towards the unhoused, rather than prejudice and criminalization.[4]

---

[4] Joshua Epstein, *Surfside Is Better Than This. Don't Criminalize Homelessness*, MIAMI HERALD (Jan. 13, 2023), available at https://www.miamiherald.com/opinion/op-ed/article271147977.html.

*Joshua's Free Speech Exposed Danzinger and Rose's Conflicts of Interest and Corruption*

62.     The Champlain Towers tragedy was personal and devastating to Joshua, who wanted closure and justice for the victims, as well as for the victims' families and friends.  When the Champlain Towers collapsed, Joshua was fifteen years old, and he volunteered to deliver food to the first responders since the streets were closed. Two of his former classmates were badly injured and lost parents.

63.     Joshua's advocacy was driven by his desire to ensure that victims of the Champlain Towers collapse were properly and respectfully remembered. He became one of the most vocal critics of Rose and Danzinger, whose constant favoritism towards DAMAC, the Dubai developer selected to rebuild at the gravesite, prioritized the developer's interests above those of the Champlain Towers' victims and their families.

64.     Danzinger secretly traveled to Dubai in October 2022 to meet with DAMAC and its billionaire owner, Hussain Sajwani. The Miami Herald exposed Danzinger's secret Dubai trip three months later, in January 2023.[5] This revelation caused outrage in the Surfside community because Danzinger curiously failed to disclose his Dubai trip on numerous occasions in response to direct questioning. To date, despite a public records request by the Miami Herald, it remains unknown how Danzinger financed this trip, which he claims he paid for "at his own expense." Joshua continuously and publicly criticized Danzinger for his secret Dubai meeting, demanding answers regarding how Danzinger funded such an expensive trip across the world.

---

[5] Liebowitz, Aaron, *Surfside mayor quietly met in Dubai with developer of Champlain Towers South site*, MIAMI HERALD (Jan. 20, 2023), https://www.miamiherald.com/news/local/community/miami-dade/miami-beach/article271365342.html.

65.     Joshua also spoke out against Danzinger and Rose at the July 25, 2023 Surfside Commission Meeting, opposing a proposed ordinance that would have granted DAMAC an exemption to standard setbacks for the Champlain Towers site. Speaking in defense of the victims' families, Joshua stated, "If the families aren't on board, then why are we giving something away to the developer, a developer that is not giving individuals who lost 98 loved ones, buried alive at that site, what they want?" He further added that it was "unacceptable" and "a stain in Surfside's history."

***Danzinger Consolidates His Power for the Town to Engage in First Amendment Retaliation***

66.     Danzinger soon realized that to control the Surfside government, he needed to control the town manager and police chief.  Danzinger achieved this end by boldly consolidating his power by orchestrating the removal of the Surfside Town manager Hyatt, the Surfside chief of police, Rogelio Torres ("Torres"), and the Surfside assistant Town manager and CFO, Jason Greene ("Greene") over a twenty-four-hour period in December 2022 ("Coup of '22").

67.     The Coup of '22 was effectively Danzinger's end-run around the Town Charter, which prohibited him (as mayor) from removing Town officials and employees.

68.     After Town manager Hyatt[6] unexpectedly and abruptly "resigned" before the December 13, 2022 Commission meeting, Danzinger swiftly proposed that he be replaced with Gomez, who was then the Surfside Public Works Director. At that meeting, Danzinger stated that Hyatt had resigned due to "family issues" and advocated for a hefty five months' severance pay and health insurance.  Upon information and belief, Danzinger forced Hyatt to resign.

---

[6] Hyatt had effectively managed the Town during the Champlain Towers collapse and had approximately eighteen years of experience working in municipal government and thirteen years as a Town or City manager.

69.     On Danzinger's recommendation, the Commission approved Gomez to be the Town manager, even though he had no prior experience managing a municipality and had previously been Surfside's Director of the Public Works Department for only one year.

70.     Despite Gomez's lack of qualifications to serve as Surfside town manager, Danzinger ensured that Gomez received a significant raise of almost $100,000 from his prior position when he was promoted to Town manager.

71.     The day after Gomez took the helm as Town manager, Torres (the chief of police) and Greene (assistant Town manager and CFO)[7] also unexpectedly and abruptly "resigned."  Upon information and belief, Gomez and Danzinger coordinated to force both Torres and Greene to resign.

72.      Gomez installed John Healy ("Healy") as the Surfside chief of police after Torres "resigned" because Healy was loyal to Rose and Danzinger's agenda.

73.     To cover his tracks for the Coup of '22, Danzinger sent a December 15, 2022 message to the Surfside constituents from his personal email address. *See* **Exhibit A**.

74.     In response to Danzinger's alarming consolidation of power, Eliana sent a parody email on January 9, 2023 to approximately 5,500 Surfside residents,[8] mimicking the look and feel of Danzinger's email. *See* **Exhibit B**.

75.     Eliana's parody email accused Danzinger of violating the Surfside Town Charter and the Florida Sunshine Law through his Coup of '22 by installing Healy as police chief and Gomez as Town manager through improper channels.

---

[7] During Danzinger and Rose's time in office, the assistant town manager/CFO position was never filled.

[8] Eliana sent the parody email to the same distribution list Danzinger used for his December 2022 email, which she had obtained from a public records request.

76.     Eliana's parody email contained a disclaimer that it was a satirical parody of Danzinger's personal emails.

> *Disclaimer: In case you haven't figured it out, this email is not affiliated with the Town of Surfside nor Mayor Shlomo Danzinger. It is a satirical parody of the oh-so-slick emails Mayor Danzinger spins out regularly from his personal email account referencing the business of the Town of Surfside…….or is it?*

77.     The Town mobilized to punish Eliana's free speech. Gomez, working in tandem with Town attorney Lily Arango ("Arango"), ordered the Surfside Police Department to launch a formal criminal investigation into Eliana's parody email, stating that they should seriously investigate the charge of "impersonating a public official." Setting aside the troubling constitutional violations, this sham investigation needlessly expended Town resources to try to arrest Eliana for her protected exercise of her First Amendment rights.

78.     The Town even (mis)used its emergency notification system, Alert Surfside, to send out a message to Surfside residents, partially written by former Town attorney Arango.  This alert accused the parody email drafter of criminal "fraud," and indicated that the Surfside Police Department was investigating this "crime"—emphasized by a photograph of a police badge.



79.    Alert Surfside emails are normally sent out for emergencies and other public-safety

concerns, not in response to a parody email criticizing the mayor.

80.    Later that same day, Danzinger sent an email from his campaign email address to

Surfside residents, repeating the Town's false allegations of "fraud" based on protected speech:

Eliana's parody of elected officials.

81.    Danzinger's email touted the subject line "Fraudulent Email Alert!!!" and

proclaimed that the Surfside Police Department was "currently investigating the matter [i.e., the

parody email], and will be taking appropriate action once more information is obtained."

82.    Danzinger refused to answer a resident's question about whether he had ordered

the police investigation of the parody email at the January 10, 2023 Town Commission meeting,

claiming from the dais that the Miami SAO was still investigating this concocted free speech "crime." However, the Miami SAO had informed the Surfside Police that there were no criminal violations related to Eliana's parody email around this timeframe.

83.     After installing their cronies as Town leaders, the Town escalated its First Amendment retaliation against Joshua as their quest for reelection on March 19, 2024 drew closer.

84.     On January 11, 2024, "Surfside Tomorrow"—the pro-Rose and pro-Danzinger newsletter—sent out an email that disparaged Joshua and Eliana, referring to Eliana as "(D-Yenta)," and to Joshua as "her schnorrer son." *See* **Exhibit C**. Upon information and belief, Danzinger and Rose were involved in the publication of this email.

85.     "Yenta" is a Yiddish derogatory term for a woman and means "one that meddles" according to Merriam-Webster. "Schnorrer" is another Yiddish derogatory term that means "beggar" according to Merriam-Webster. Given Surfside's large Jewish population, these offensive meanings were clear to the public.

86.     Joshua, as an amateur journalist who was marked by the Champlain Towers tragedy, remained resolute in his quest to expose the identity of who paid for Danzinger's expensive trip to Dubai to meet with DAMAC. Joshua took videos of Danzinger twice in January 2024 while he was exiting Surfside Town Hall, questioning him about "missing" Dubai receipts. As mayor, Danzinger only made a salary of $1, and Joshua believed that Danzinger did not pay for the trip himself and wanted to ensure that Danzinger's benefactor was not associated with DAMAC to curry favors with the Surfside government.

87.     Danzinger refused to answer Joshua's questions on both occasions, even though Danzinger and Rose had advocated for Surfside to grant lucrative zoning favors to DAMAC, the same billionaire developer Danzinger met with in Dubai. Joshua published one of the videos

showing Danzinger's refusals to answer his questions on NextDoor on January 30, 2024, a community social media application, where it garnered attention from Surfside residents.

88.     A few weeks later Danzinger ordered Marciante, who he had recently installed as Chief of Police after Healy had retired, to remove Joshua from the February 13, 2024 Surfside Commission meeting for asking him once again about the missing Dubai receipts.

89.     Danzinger retaliated against Joshua through this abuse of power by attempting to silence him, as shown below.



90.     Indeed, on a multitude of occasions Danzinger ordered the Surfside Police Department to remove residents from commission meetings based on the content of their speech.

91.     By way of example, Danzinger ordered four Surfside officers to remove a resident from the June 14, 2022 Town Commission meeting after she raised concerns about the commercialization of the Town, alleged conflicts of interest, and suggested that certain development plans were advancing the personal real estate and lobbying interests of Rose and Danzinger, as shown below.



92.     Danzinger ordered Marciante and Officer Marian Cruz to remove current Surfside

Mayor Charles Burkett from the July 25, 2023 Special Commission Meeting.



93.     At the January 9, 2024 Commission Meeting, Rose openly threatened Surfside

residents with First Amendment retaliation.[9] Rose warned his constituents that if residents reported

---

[9]  Rose's comments were in direct response to Joshua's mother, Eliana, reporting Rose to FEMA
and the Miami SAO for fraud on January 8, 2024 in connection with a development property in
Surfside. Despite obvious conflicts of interest, Rose had appointed an individual connected to the

Surfside actions to governmental agencies such as the Florida Department of Transportation ("FDOT") or the Miami-Dade Department of Environmental Resources Management ("DERM"), he would find out which residents made complaints through public records requests and those residents would be "called out" publicly at a later commission meeting as a direct consequence of their speech.

94.     At that same meeting, from the Surfside dais, Danzinger interrupted Eliana during her allotted three minutes time for public comment and shouted at her as she attempted to exercise her First Amendment rights, stating: "Don't ask me to get the police involved . . . If you do not sit down, I am having you removed from the room."

95.     Rose then introduced a motion to permit a mixed-use property at 9300 Collins Avenue in Surfside, a development with eighty-seven residential units totaling 140,637 square feet and a small synagogue of about 1,200 square feet, located in an AE Flood Zone. Joshua opposed the motion, arguing that the developers were misclassifying the project as mixed-use by including the synagogue in an attempt to circumvent FEMA regulations prohibiting underground parking in AE Zones. He urged the commission to "stand up for residents" and "stop being bought and sold by developers that are going to offer [them] favors."

96.     Due to Defendants' policy of First Amendment retaliation, Surfside residents became fearful to exercise their First Amendment rights to attend and speak at Town Commission meetings.

97.     Following his remarks at the February 13, 2024 Commission meeting, Joshua sent an email through the Surfside Tomorrow activist group newsletter on February 15, excerpted

---

property developer to the Surfside Planning & Zoning Board, where he influenced zoning changes that benefited both himself and the developer.

below, outlining the connections among Danzinger, Rose, and DAMAC. The email, which Joshua distributed to thousands of Surfside residents, highlighted their conflicts of interest and violations of Florida's public records laws.



98.   In that same email, Joshua criticized Rose and Danzinger for voting against the ordinance that would have compelled Danzinger to release the receipts from his Dubai trip. Danzinger did not even recuse himself from the vote, a fact that Joshua highlighted.

***Joshua Videotaped the Rose Rage Incident and Distributed It to the Surfside Electorate***

99.   Joshua attended the February 28, 2024 debate of the Surfside candidates running for commissioner, which featured Rose, who was seeking reelection along with eight other commissioner candidates.

100.   After the debate in the Commission Chambers at Town Hall, Rose angrily charged towards Surfside resident Oliver Sanchez ("Sanchez") because Sanchez allegedly "got in [Rose's] mother's face" in the hallway during the debate according to Rose's wife.

101.   Joshua, who was standing behind and to the left of Sanchez, pulled out his phone to video Rose's aggressive interaction with Sanchez.

102.    Rose was escorted out of the chambers by Jose Feliz ("Feliz"), the Town's IT manager, and started to head towards the stairs to exit Town Hall.

103.    When Rose noticed that Joshua was videotaping the incident, his anger escalated. Rose doubled back, approaching Joshua aggressively. Rose became so irate when he noticed Joshua was recording him that Feliz held Rose back from further approaching Joshua.

104.    As seen on the video, Rose yells that Joshua is "just like [his] mother" even though Eliana had not attended the Town Hall commission debate that night.

105.    Joshua posted the Rose Rage Video on NextDoor soon after he recorded it for Surfside residents to be aware of Rose's aggressive behavior.

106.    Joshua was afraid that Rose would physically harm him due to Rose's intense aggression, so he filed a police report with the Surfside Police Department that same night around 10 p.m., seeking police protection from Rose. Eliana soon joined Joshua at the Surfside police station and immediately asked the officers to obtain the video of the incident from the commission chambers.

107.    Joshua showed Officer Matthews and Surfside Sergeant Julio Torres ("J. Torres") the Rose Rage Video repeatedly when explaining that he feared for his safety due to Rose's aggression towards him.

108.    Eliana called Sanchez, who stated on speakerphone that he had been planning to file a police report against Rose the next day for Rose's aggressive behavior against him.  Sanchez and his wife decided to come to the Town police station that night to give their statements that Rose had tried to attack Sanchez after the debate, just before Joshua began filming.

109.     While at the police station, Joshua exchanged comments with Rose's family on the NextDoor post where he had published the Rose Rage Video, informing them that he was filing an incident report against Rose at the Surfside police station.

110.     When Rose realized that Joshua was reporting him to the police, Rose called the Surfside Police Department himself to report his bogus claim that Joshua had battered him.

111.     After Rose's call, Surfside Sergeant J. Torres left the station for approximately thirty minutes. It is now known that he went to visit Rose at his nearby home with Officer Diana Hernandez.

112.     Upon returning to the station from Rose's house, Officer Matthews and Sergeant J. Torres informed Joshua that the commission chambers had no video cameras. They reported that they had spoken with Rose, who had declined to press "charges" against Joshua for an alleged push and signed a non-prosecution form.

113.     Joshua was confused and surprised by Rose's mischaracterization of the incident. As the video demonstrates, Rose was aggressive towards Joshua, not the reverse—a narrative Rose adopted only after learning that Joshua was filing a police report against him at the station.

114.     Before Joshua and his mother left that evening, the Surfside Police Department assured them that the entire matter was closed, and told Joshua he could pick up a copy of the police report once it was ready.

115.     Officer Matthews from the Surfside Police Department prepared a February 28, 2024 Offense Incident Report ("OIR") documenting Joshua's account and Rose's fabricated allegation of battery.

116.     The OIR—drafted contemporaneously with the events—classified Rose's fabricated allegation as simple misdemeanor battery, **not** felony battery. This contemporaneous

classification, which was based on Rose's bogus report, shows that the felony battery charge was an after-the-fact planned decision by Defendants to inflict as much harm as possible.

117.    The next day at 5:02 p.m., Joshua published his Rose Rage Video through the Surfside Tomorrow activist group newsletter. The video was distributed via email to approximately 5,185 recipients (roughly every Surfside resident) under the subject line "Jeff Rose Attempted Assault."

118.    The Individual Defendants all viewed the newsletter containing the Rose Rage Video that same day.

***Surfside Wrongfully Arrested and Incarcerated Joshua for His Protected Speech***

119.    Joshua's Rose Rage Video went viral.  To punish Joshua for his speech, Defendants began plotting to arrest and prosecute Joshua for a non-existent "felony battery" of Rose.

120.    Joshua did not batter Rose. After observing Rose yelling at Sanchez, Joshua began recording Rose's aggression with his phone. Rose's behavior escalated upon realizing he was being videotaped, and he redirected his anger from Sanchez to Joshua.

121.    Former Surfside Detective Sergeant Marian Cruz ("Cruz") called an Assistant State Attorney ("ASA") at the Miami SAO approximately one hour after Joshua distributed the Rose Rage Video on February 29, 2024.

122.    On March 1, 2024, a Miami-Dade ASA informed former Detective Cruz that he could not expressly authorize the Surfside Police Department to arrest Joshua based on the facts.

123.    Nonetheless, Rose, Gomez and Marciante, acting under color of Florida law and cloaked in authority from Surfside, developed a comprehensive plan to punish and deter Joshua based on his political expression.  Their plan was to help Rose save face for the upcoming election

by painting Joshua—who was merely filming Rose's outburst —as the "aggressor," which Joshua never was.

124.     As part of their plan, the Town, Rose, Gomez and Marciante coordinated to falsely arrest Joshua on his way to the Town lap pool that Friday evening for allegedly "battering" Rose. Despite there being no risk of flight, no danger to the community, and no other exigent circumstance, they plotted to arrest Joshua in a manner that would inflict the most trauma.

125.     Defendants were motivated to punish Joshua for his speech—and deter future speech—based on the content of his speech.

126.     Additionally, although no battery occurred and the alleged "push" never happened, Defendants deliberately strategized to falsely arrest Joshua on a felony charge for the purpose of ensuring that he would be transported to Turner Guilford Knight Correctional Center ("TGK") and forced to spend Friday night in jail until he could appear before a judge.

127.     Joshua's family were well known lap swimmers at the Surfside community pool at the time of Joshua's retaliatory arrest. Joshua himself had a reservation listed under his name from 5:30 p.m. to 6:30 p.m. that Friday evening of March 1, 2024 in the Town's online lap lane reservation system. Eliana also had a reservation from 5:30 p.m. to 6:30 p.m., and Joshua's father and brother had reservations from 6:30 p.m. to 7:30 p.m.

128.     Notably, Marciante spoke with Tim Millian, the Director of Parks & Recreation, several times throughout the course of that day.

129.     Marciante and Gomez, coordinating with Rose, directed the Surfside Police Department to arrest Joshua in retaliation for his protected speech the evening he had his lap lane reservation—just one day after Joshua emailed the Rose Rage incident to approximately 5,185 Surfside residents.

130.    Upon information and belief, Danzinger was also involved in the coordination and planning of Joshua's arrest.

131.    A Surfside Police Department patrol car with its lights flashing intercepted Joshua in the street while he was walking to the Town pool. Officers Tammy Campbell ("Campbell") and Samuel Villegas ("Villegas") arrested Joshua for felony battery of a public official (Rose) at 5:47 p.m. that evening of March 1, 2024.

132.    Campbell and Villegas requested that Joshua turn over his cellphone during his arrest, and he complied.

133.    After he handed his cell phone over, Joshua's Apple watch picked up Surfside Commissioner Velasquez's call, and Joshua told her he was being arrested and asked her to tell Eliana.

134.    Commissioner Velasquez immediately called Eliana to inform her of her son's arrest.

135.    Joshua's family and grandmother expected him for Shabbat dinner after his swim. Had it not been for Joshua's Apple watch, his family would not have learned what happened to Joshua until many hours later after he was processed at TGK.

136.    Eliana immediately rushed to the Town Hall with Joshua's medical prescriptions, with the expectation that Joshua would be there in the holding cell. Eliana then discovered that Joshua was en route to TGK, leaving Eliana devastated and frightened for her son's wellbeing, especially since Joshua was taking a daily prescription and missing a dose could severely endanger his health.

137.    During his arrest and transport to TGK, Joshua explained to Officers Campbell and Villegas that he needed to take his medication because if he suddenly discontinued it, his health could be severely compromised.

138.    Joshua had his prescription in his backpack at the time of his arrest. However, Officers Campbell and Villegas informed Joshua that he could not take his prescription into TGK with him, explaining that he could obtain his medicine at the jail pharmacy once he was processed. Sitting handcuffed in the squad car on the way to TGK, Joshua was extremely stressed and concerned for his health while in shock due to his false "felony battery" arrest.

139.    About one hour later, Joshua arrived at TGK. The booking process was lengthy, and Joshua was not taken to a cell until the early morning hours of March 2, 2024.

140.    At TGK, Joshua spent hours in a large lobby with other arrestees. Corrections officers strip-searched him, photographed him for a mugshot, and provided him with a jail jumpsuit. While in the lobby, Joshua felt extremely scared and intimidated after other detainees disclosed they had been arrested for serious crimes including rape, attempted murder, and armed robbery.

141.    Corrections staff ignored Joshua's pleas for his critical prescription medication. As a result of missing his scheduled dose, Joshua experienced physical illness, lightheadedness, and felt as though he might pass out or lose consciousness.

142.    Throughout his arrest, incarceration, and the entire ordeal, Joshua was extremely frightened and traumatized by being jailed and prosecuted for a crime he did not commit—a prosecution he believed was designed to punish him for exercising his right to free speech in the United States.

143.     Despite arriving at TGK in the early evening, Joshua was not assigned a cell until approximately 3-5 a.m. Throughout his incarceration that day, Joshua could not sleep at all and called his parents several times in a state of shock and disbelief. Being wrongfully jailed at TGK caused him constant, overwhelming anxiety, and stress.

144.     Surfside residents learned of Joshua's retaliatory arrest and were outraged, organizing an impromptu protest that same evening at Surfside Town Hall demanding "Justice for Joshua." Numerous witnesses provided sworn statements to the Surfside Police Department refuting that Joshua battered Rose before filming the Rose Rage Video.

145.     Joshua was ordered released on his own recognizance by the Honorable Mindy S. Glazer on March 2, 2024 in the early afternoon but was not actually released from TGK until around 8 p.m. that evening.

146.     The Court also ordered Joshua to maintain a distance of at least twenty-five (25) feet from Rose. Judge Glazer explained that this minimal stay-away distance was specifically designed to allow Joshua to continue his student activism, resident journalism, and attendance at Town commission meetings without violating the order.

147.     The arrest affidavit, which is sworn to by Detective Ariol Lage ("Lage"), fails to mention any independent investigation.

148.     On March 5, 2024, Danzinger sent an email to Surfside residents regarding Joshua's arrest, entitled "An urgent message regarding the recent town hall incident." The email stated that "When the Vice Mayor intervened to address the situation, he was physically attacked in front of his family by another individual"—referring to Joshua. Danzinger sent this email from his personal mayoral campaign email address.

149.     That same day, Danzinger also posted a similar message on NextDoor, the popular community social media app, signed "Shlomo Danzinger, Mayor of Surfside." When questioned about his personal knowledge of the events, Danzinger deleted the post. A copy of the since-deleted post is attached hereto as **Exhibit D**.

***Florida Statutes § 784.081(2) Is Not Used to Charge Battery of Elected Officials***

150.     Surfside and the Individual Defendants decided to charge Joshua with felony battery on a public official, relying on Florida Statutes § 784.081(2). However, this statute is not used for battery of elected officials.

151.     In fact, internal emails between Miami SAO prosecutors explain the inapplicability of Florida Statutes § 784.081(2), stating: "It clearly does not apply to all elected officials…but to specified officials within the school district, to wit: 'educators.' The statute and case law are very clear….no further clarification is needed."

152.     The Miami SAO further determined that there were "factual and legal reasons" why Joshua could not be charged with any other crime.

153.     The Miami SAO's analysis of this statute was accurate.  A review of felony data from Miami-Dade County, Florida over the past five (5) years establishes that the felony statute for "assault or battery on specified officials or employees" has never been used in Miami-Dade County, Florida to criminally charge a battery on an ***elected official***.

154.     Nineteen arrest affidavits obtained from the Miami-Dade County Sheriff's Office for the same felony battery statute used to charge Joshua contained no allegations even closely resembling those Defendants made against Joshua.  This statute was used to charge for batteries against security guards (six arrests), school officials (three arrests), sports referees (two arrests),

medical employees (two arrests), public transit drivers (two arrests), correctional officers (two arrests), and a law enforcement officer (one arrest).

155.    Examples of the severe and dangerous criminal conduct charged under Florida Statutes § 784.081(2) include: throwing a security guard to the ground while forcefully punching and kicking his head; similarly violent punching and kicking of a soccer referee's head while he was on the ground; spitting on a healthcare provider while HIV positive; and an incident where a driver blocked a bus with his car, then brandished a gun and threatened the bus driver after banging on his window.

156.    Surfside's own data is equally striking: in the last five years, Joshua is the only individual charged under this felony battery statute.

157.    The data is clear. Defendants used this felony statute as a pretext to violate Joshua's First Amendment rights by arresting him in retaliation for his protected speech.

***Danzinger and Rose Defamed Joshua and Encouraged Joshua's Prosecution***

158.    While Joshua's criminal charges were pending, Rose and Danzinger used their elected positions of power to continue to retaliate against him for his free speech. Upon information and belief, Rose and Danzinger were behind a March 13, 2024 email sent to the Surfside electorate entitled "Activism of Attention Seeker." This email defamed Joshua by falsely claiming he was "harassing" elected officials' wives and children and baselessly accused him of stalking wives and children by "repeatedly following and filming families in their day-to-day activities . . . [an] unnerving pattern of behavior."

159.    Meanwhile Rose had active construction projects in progress all over Surfside, which caused Joshua to worry that he could inadvertently violate the Court's order to stay away from Rose just by going about his daily routines in the community.

160.    Concerned for his personal safety, Joshua decided to leave Miami. On March 13, 2024, he traveled to New Jersey to stay with family.

161.    For his part, Rose was emboldened and even tried to have the Surfside Police arrest a reporter on March 15, 2024 for interviewing him on Town property. The reporter questioned Rose about a house he had developed seemingly used as a home address for three Hollywood, Florida residents to vote in the Surfside election, implicating voter fraud. Rose claimed the reporter was "harassing" him during the failed television interview, calling the police while being recorded.[10]

162.    The day before the election on March 18, 2024, Danzinger wrote an "Urgent" email to the State of Florida Office of the Attorney General, copying several members of the Florida House of Representatives, the Florida Senate, the Miami SAO, Town attorney Arango, and Rose. Danzinger sought a legal opinion that the felony battery statute applied to Joshua's alleged offense, even accusing Joshua's family of improperly influencing prosecutorial discretion. Danzinger emphasized that "time [was] of the essence" for the prosecutors to pursue Joshua "for the ongoing safety of all elected officials in the State of Florida."

---

[10] Jeff Weinsier, *Probe launched into possible Surfside voter irregularities: 'We just want a fair election'*, Local 10 News (Mar. 15, 2024), available at https://www.local10.com/news/local/2024/03/15/probe-launched-into-possible-surfside-voter-irregularities-we-just-want-a-fair-election/.

Dear Mr. Weilhammer,

I am reaching out to your office to bring attention to a significant issue that will impact all elected officials in the State of Florida.

This concerns an ongoing criminal case in Surfside involving an 18-year-old male who was arrested on a third-degree felony charge following an alleged battery incident. The on-shift State Attorney (SA) informed our officers of the felony charge which resulted in the arrest, citing Florida Statute 784.081; 'Assault or battery on specified officials or employees; reclassification of offense'.

It has come to my attention however, that due to pressure from the family, the SA Prosecutor handling the case, Roberto Fiallo, is seeking to dismiss the charges by reinterpreting the Florida Statute to apply only to officials or employees of a school board, school district, etc.

The potential ramifications for all elected officials in the State of Florida are significant if the State Attorney's Office formally adopts this interpretation of the Statute.

For the ongoing safety of all elected officials in the State of Florida, I respectfully request that your office issue an opinion letter regarding Florida Statute 784.081(2) to clarify the matter.

Time is of the essence, and I thank you for your attention to this important matter.

Sincerely,

**Shlomo Danzinger**
Mayor



163.     All along, Defendants were motivated to punish Joshua for his speech—and deter future speech—based on the content of that speech. The Miami SAO internally noted that Joshua's family did not influence them, and that "there were factual and legal reasons" why the SAO "couldn't charge any crime. It has nothing to do with pressure from a family or anyone else.  It is just plain legal and factual analysis."

***Retaliation Stopped After Rose and Danzinger's Defeat; Felony Charges Are Dropped***

164.     Rose and Danzinger were voted out of office by the Surfside electorate on March 19, 2024.

165.     Once Rose and Danzinger were defeated, the Town's retaliation against Joshua for his protected speech completely ceased.

166.     Gomez, still acting as Town manager, allowed Marciante to resign as Surfside Chief of Police on March 29, 2024.

167.    Gomez informed Town employees that he was resigning that same day and would be "separating with the Town in two weeks."

168.    Joshua reluctantly and anxiously returned to Surfside from New Jersey to attend his court hearing, scheduled for April 1, 2024.

169.    The Miami SAO declined to file the felony battery charge against Joshua on April 1, 2024.

170.    The new Surfside police chief, Interim Chief Henry Doce ("Doce"), began to root out the sources of corruption that enabled Defendants' abuse of the Surfside Police Department to retaliate against Joshua and the Surfside community for their protected speech. Doce soon demoted Cruz, Lage's supervisor, from sergeant to police officer with a reduced salary and less benefits. The Surfside Police Department found that Cruz lacked "supervisory capability," had "inadequate case and personnel management," and showed "mismanagement of sensitive issues."

171.    Lage was demoted from detective to patrol officer. Lage's demotion similarly came with a lower salary, longer shifts, and his cell phone stipend being revoked.

172.    Had Defendants not harbored retaliatory animus towards Joshua's speech, they would never have retaliated against him by harassing, disparaging and mobilizing the Surfside Police Department against him.

173.    The First Amendment retaliation and retaliatory arrest manufactured by Defendants directly and proximately caused severe harm to Joshua, including but not limited to:

    a.    ***The harm to Joshua's reputation***. The mere fact of being criminally investigated and prosecuted—even for baseless charges—has irreparably damaged Joshua's reputation. The retaliation has undermined Joshua's ability to pursue his career goals as well as his role as a community activist. Joshua's mugshot was displayed

repeatedly online, reverberating both in his local community and beyond, and he also appears handcuffed in Court in an orange jumpsuit on the internet. These widely published images negatively impact Joshua's standing in any community where he chooses to live. Joshua was the subject of repeated news articles about his arrest for "battering" Rose. To this day, the harmful and damaging news articles with Joshua's mugshot appear when one searches his name on the internet. Moreover, Danzinger continued to disparage and defame Joshua during his campaign for Miami-Dade County Mayor. The reputational harm continues to this day and is likely to continue in the future.

b.      ***The harm to his future opportunities***. Joshua's future business opportunities have been severely impacted because of Defendants' retaliation.  Joshua's arrest and felony charge have damaged his future financial earning potential. Because a search of Joshua's name brings up his felony arrest as the top result, many future potential firms or clients will be deterred from hiring him as a summer associate or attorney. When Joshua applied to law schools in early 2025, nineteen of his applications required him to disclose his felony arrest and provide an additional "character and fitness" statement regarding the circumstances of the arrest. Joshua's felony arrest is now a matter of public record that will never be erased from the internet. When Joshua applies for a job or when he applies for admission to the Bar, his chances of success are now significantly diminished by the felony arrest, which will show up on background checks and exists in perpetuity on the internet.

c.      ***The harm to his finances***. Joshua struggled to work in the aftermath of Defendants' retaliation.  Joshua was planning to work in 2024 and 2025 to improve his

chances of getting into a top-tier law school, but he was unable to do so because of the stress and anxiety he still endures due to Defendants' constitutional violations.

        d.     ***The harm to his emotional and psychological wellbeing***.   Joshua has suffered and continues to suffer severe emotional distress and trauma from Defendants' retaliation that culminated in Joshua's arrest. This serious harm impacted his family relationships, as well as his relationships with his friends.  Joshua even left Surfside for New Jersey after he was released from jail because he feared for his physical safety due to Defendants' willingness to abuse their power via their control over the Surfside Police Department.  To this day, Joshua feels stressed, anxious and uncomfortable when he visits Surfside during law school breaks due to the trauma from his false arrest. He also no longer wishes to live in Surfside after graduating from law school.

        e.     ***The harm to his physical health***.  Trauma brought on by Joshua's wrongful incarceration and his criminal prosecution has led to extreme stress, many sleepless nights as well as anxiety-filled days, resulting in the overall deterioration of his physical health.

**COUNT I**
**42 U.S.C. § 1983 – First and Fourteenth Amendment Retaliatory Arrest Claim**
***Joshua against the Individual Defendants***

174.    Joshua realleges and incorporates paragraphs 1 through 173 of this Complaint as if fully stated herein.

175.    The Individual Defendants individually and collectively, while acting under color of law, engaged in conduct which constituted a violation of Joshua's First Amendment Rights by retaliating against him for exercising those rights.

176.    The Individual Defendants individually and collectively, engaged in various harmful acts against Joshua in violation of clearly established First Amendment law, resulting in his arrest.

177.    Defendant Rose lodged a baseless criminal battery complaint against Joshua and participated in and encouraged a criminal investigation and criminal charges for his baseless complaint.

178.    Defendant Gomez ordered Town officials to conduct a criminal investigation into the baseless criminal complaint made by Rose and participated in coordinating Joshua's arrest.

179.    Defendant Marciante coordinated Joshua's arrest and tasked his officers with bringing charges against Joshua, including instructing Officer Campbell to arrest Joshua and take him to TGK.

180.    Rose, Gomez, and Marciante intentionally charged Joshua with a felony so that he would be arrested, taken into custody, be precluded from bonding out prior to going before a judge, and forced to stay in TGK overnight to appear before a bond hearing judge the next day.

181.    Upon information and belief, Danzinger was involved in the coordination and planning of Joshua's arrest. After Joshua's arrest, Danzinger erased the contents of his Town laptop, and his Town-issued phone subsequently went missing.

182.    Defendant Danzinger wrote an "Urgent" email to the State of Florida Office of the Attorney General, copying several members of the Florida House of Representatives, the Florida Senate, the Miami SAO, Town attorney Arango, and Rose. Danzinger sought a legal opinion that the felony battery statute applied to Joshua's alleged offense, even accusing Joshua's family of improperly influencing prosecutorial discretion. Danzinger emphasized that "time [was] of the

essence" for the prosecutors to pursue Joshua "for the ongoing safety of all elected officials in the State of Florida."

183.    All these actions are independently unconstitutional but were also intended to warn other Surfside residents that if they challenged the Individual Defendants by exercising their First Amendment Rights, there would be dire consequences.

184.    It is clearly established that retaliating against individuals by arresting them under a law that is not used to arrest similarly situated individuals is a violation of the First Amendment. Every reasonable government official has a fair warning that doing so and participating in a scheme to do so is unconstitutional.

185.    It is furthermore clearly established that retaliating against individuals by engaging in the various harmful acts described in this Complaint is a violation of the First Amendment. Every reasonable government official has a fair warning that doing so and participating in a scheme to do so is unconstitutional.

186.    The facts demonstrate that the felony criminal charge the Individual Defendants used against Joshua was a sham charge, regardless of attempts to fabricate probable cause. Thus, even if probable cause existed, the application of an inapplicable law to Joshua is insufficient to outweigh the retaliatory animus illustrated by the surrounding circumstances. The facts cannot objectively justify Joshua's arrest.

187.    No other similarly situated individuals have been charged or arrested by the Surfside Police Department or the Miami-Dade County Sheriff's Office as Joshua was.

188.    Moreover, the Individual Defendants were not acting under any time constraint and did not make any split-second decisions regarding Joshua's arrest.

189.     Furthermore, Joshua's free speech is not a legitimate consideration in determining whether to make an arrest based on the claim that he allegedly battered Rose.

190.     Had it not been for the Individual Defendants' retaliatory animus, they would have never arrested Joshua for his actions related to publicly criticizing Surfside public officials.

191.     As a result of the foregoing, Joshua was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, suffered severe emotional distress, suffered economic damages, was incarcerated, and was caused to feel unwell during the arrest proceeding and had his personal reputation and good name irreparably damaged in the eyes of anyone with access to the internet.

192.     Joshua is entitled to punitive damages against the Individual Defendants (who are named in their individual capacities) because they acted willfully with malice or reckless indifference to Joshua's First Amendment rights.

**COUNT II**
**42 U.S.C. § 1983 – First and Fourteenth Amendment Retaliatory Arrest Claim**
*Joshua against Town of Surfside*

193.     Joshua realleges and incorporates paragraphs 1 through 173 of this Complaint as if fully stated herein.

194.     Defendant Town of Surfside, through the Individual Defendants and its other employees who were acting under color of law, adopted and enforced an official policy or custom to retaliate against Joshua for his First Amendment activities, including the expression of his political thought through speaking out to oppose his elected officials at Commission Meetings, engaging in peaceable assembly by holding rallies in Surfside, posting on social media such as NextDoor, writing an Op-Ed in the Miami Herald, providing statements to the media, supporting

Rose and Danzinger's political opponents in an election, and disseminating the Rose Rage Video during an electoral campaign to encourage voters to support different candidates.

195.    Surfside began its retaliation against Joshua by publicly defaming him in response to his protected speech. Then, Surfside began curtailing Joshua's speech by removing him from a Surfside Commission Meeting when he tried to speak out to oppose Danzinger and Rose.

196.    The retaliation escalated when, as noted in Count I and elsewhere in the Complaint, Surfside retaliated against Joshua in violation of the First Amendment by concocting a scheme to arrest Joshua on a manufactured felony charge.

197.    This scheme was part of an official policy or custom that was deliberate, long-term, and pervasive, unlike split second arrest decisions that are made sometimes by individual officers.

198.    The decision to arrest Joshua can also be easily disentangled from his speech: unlike in situations when an officer must consider speech when determining whether an arrest is warranted, here, there was no need to consider any of Joshua's speech to determine whether the felony battery charge was warranted. Put simply, Joshua's speech had nothing to do with evaluating whether a battery took place.

199.    The actions of the Individual Defendants and other Surfside employees are attributable to the Town. As final policymakers with final authority, or who were delegated authority, Gomez and Marciante made a deliberate choice to adopt a course of action that retaliated against Joshua and resulted in his arrest. They also ratified the retaliatory acts.

200.    Gomez is a final policymaker pursuant to the Town of Surfside Charter, with the ability to direct the Surfside Police Department, which he did as alleged in this Complaint. Marciante, as chief of police of the Surfside Police Department, is a municipal policymaker whose decisions and actions within the police department are representative of Surfside policy.

Alternatively, Gomez ratified the conduct of the Surfside Police Department as it related to Joshua's unlawful arrest.

201. At Gomez's direction or with his ratification, Marciante coordinated Joshua's arrest and tasked his officers with bringing charges against Joshua, including instructing Officer Campbell to arrest Joshua for a felony in order to incarcerate him at TGK and inflict the most damage on Joshua.

202. The case against Joshua was no actioned by the Miami SAO.

203. The actions undertaken or ratified by Surfside constitute the moving force behind the retaliatory arrest aimed at Joshua's exercise of his First Amendment rights.

204. Had it not been for retaliatory animus, Surfside would have never caused, permitted, or approved Joshua's arrest.

205. Alternatively, the Town has a persistent and widespread practice of retaliating against Town residents who voice criticism of the Town or its officials.

206. In addition to Joshua's arrest, the Town has a history of shutting down disfavored speech.

207. As detailed more fully herein, in January of 2023, the Town mobilized and misused its resources to criminally investigate Eliana for sending a parody email criticizing Danzinger.

208. Additionally, on a multitude of occasions, the Town removed residents from Commission Meetings for exercising their First Amendment rights.

209. For example, Danzinger ordered Marciante to remove Joshua from the February 13, 2024 Surfside Commission meeting for discussing the Dubai receipts.

210. Danzinger also ordered four Surfside officers to remove a resident from the June 14, 2022 Town Commission meeting and ordered Marciante and Officer Marian Cruz to remove

current Surfside Mayor Charles Burkett from the July 25, 2023 Special Commission Meeting because they exercised their First Amendment rights to speak out against Surfside officials.

211.    Rose also openly threatened Surfside residents at the January 9, 2024 Commission meeting that if they exercised their First Amendment rights, they would be publicly "called out."

212.    The Individual Defendants were in positions of power in Surfside. As final policymakers, they had actual or constructive knowledge of this unconstitutional policy or custom of retaliating against Town residents who criticized the Town or its officials.

213.    But for the Town's policy or custom of retaliation in response to criticism of those in power, Joshua would not have been deprived of his liberty, denied his fundamental constitutional rights, and publicly embarrassed and humiliated.

214.    As a result of the foregoing, Joshua suffered severe emotional distress, suffered economic damages, was incarcerated, and was caused to feel unwell during the arrest proceeding and had his personal reputation and good name irreparably damaged in the eyes of anyone with access to the internet.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants on each cause of action in amounts to be determined upon the trial of this action, inclusive of compensatory damages, reputational harm, emotional distress, and consequential damages against all Defendants and punitive damages against the Individual Defendants, and inclusive of costs and disbursements of this action and inclusive of statutory interest on such damages, costs and fees, and such other relief as is appropriate under the law. Moreover, Plaintiff is entitled to and demands an award of reasonable attorney's fees pursuant to 42 U.S.C. §§ 1983 and 1988, as well as all other relief that the Court may deem just and proper.

## **JURY TRIAL DEMAND**

Plaintiff respectfully demands a trial by jury on all claims and issues so triable.

Dated: January 29, 2026

Respectfully submitted,

*/s/ Courtney Caprio*
Courtney Caprio, Esq.
Florida Bar No. 933961
Amanda Suarez, Esq.
Florida Bar No. 1030808

**CALDERA LAW PLLC**
7275 NW 1st Ct, Unit 104
Miami, FL 33150
(786) 321-3811
courtney@caldera.law
amanda@caldera.law
eservice@caldera.law

*Counsel for Plaintiff*